# United States Court of Appeals
## For the First Circuit

No. 21-1899

MAC HUDSON,

Petitioner, Appellant,

v.

SHEILA KELLY,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Indira Talwani, U.S. District Judge]

Before

Barron, Chief Judge,
Howard and Gelpí, Circuit Judges.

Alan D. Campbell for appellant.
Eva M. Badway, Assistant Attorney General of Massachusetts,
with whom Andrea Joy Campbell, Attorney General of Massachusetts,
was on brief, for appellee.

March 5, 2024

**BARRON**, **Chief Judge**.  Mac Hudson appeals from the District Court's denial of his petition for a writ of habeas corpus challenging his 1997 Massachusetts state-law convictions for, among other things, second-degree murder.  We affirm.

**I.**

**A.**

In 1990, Hudson and Charles Hughes were tried together in Massachusetts Superior Court for charges relating to the April 22, 1989 shootings of Derek Twitty and Mark Jones while they were selling heroin in Boston, Massachusetts.[1]  Twitty died from his injuries, while Jones survived.  The charges were for first-degree murder, assault and battery by means of a dangerous weapon, assault with intent to murder, assault with intent to rob, and unlawful possession of a firearm.  Hudson and Hughes were found guilty of the lesser-included offense of second-degree murder and the other charged offenses.  Commonwealth v. Hudson, 30 N.E.3d 133, 2015 WL 2037025, at *1 (Mass. App. Ct. 2015) (unpublished table decision).  The Massachusetts Appeals Court ("MAC") later reversed those convictions for reasons not relevant here and remanded the case

---

[1] We recount the facts of the case as they were found in the last reasoned decision by a state court -- here, the Massachusetts Appeals Court's decision in Commonwealth v. Hudson, 30 N.E.3d 133, 2015 WL 2037025 (Mass. App. Ct. 2015) (unpublished table decision), review denied, 35 N.E.3d 720 (Mass. 2015) -- "supplemented with other facts from the record that are consistent" with the MAC's findings, Lynch v. Ficco, 438 F.3d 35, 39 (1st Cir. 2006).

for a new trial.  See Commonwealth v. Hudson, 634 N.E.2d 154 (Mass. App. Ct. 1994) (unpublished table decision).

Hudson and Hughes were tried for the second time in 1997 in connection with the shootings of Twitty and Jones.  Hudson, 2015 WL 2037025, at *1.  Hudson's resulting convictions are the subject of the federal habeas petition before us here.

At the start of jury empanelment for this second trial, Hudson was informed by the trial judge that sixteen jurors would be seated and that he would have sixteen peremptory challenges.  See Commonwealth v. Hudson, 735 N.E.2d 1272, 2000 WL 1477124, at *1 (Mass App. Ct. 2000) (unpublished table decision).

Toward the end of the third day of jury selection, by which point fifteen jurors had been seated, the trial judge commented about trying to seat the sixteenth juror by stating "[w]e're going to try one more, and after that I quit."  After another juror was interviewed and excused for cause, the trial judge announced that the proceedings would go forward with only fifteen jurors.  At this point, Hudson had exercised only eleven of his sixteen allotted peremptory challenges, and counsel objected, stating that he had been saving his challenges to use on a "perfect [sixteenth] juror."  The trial judge noted the objection yet proceeded to trial with the fifteen jurors.

At trial, the Commonwealth called four individuals to testify as eyewitnesses to the shootings -- Keil Kimbrough, Dwayne

- 3 -

Moody, Larry Brown, and Jones, the surviving victim. See Hudson, 2015 WL 2037025, at *1. Each of these witnesses had also testified at the first trial of Hudson and Hughes. See Commonwealth v. Hudson, 846 N.E.2d 1149, 1153 (Mass. 2006). Moody identified Hudson and Hughes as having committed the shooting, while Jones stopped short of positively identifying Hudson as his attacker. Hudson, 2015 WL 2037025, at *1.

At the first trial, Kimbrough testified that he had been present at the scene of the shootings. Hudson, 846 N.E.2d at 1153. However, prior to the second trial, Kimbrough signed an affidavit that recanted his testimony at the first trial, stated that he had not in fact been present at the scene of the shooting, and claimed that a police officer had instructed him on how to testify in exchange for "consideration" in pending criminal matters of his own. Id. at 1154. For that reason, Kimbrough invoked his Fifth Amendment right against self-incrimination when called by the Commonwealth to testify at the second trial. Id.

After appointing counsel for Kimbrough and considering the issue, the trial judge concluded that there was "some risk" that Kimbrough could expose himself to a prosecution for perjury were he to testify and consequently declared Kimbrough unavailable. Id. The trial judge then permitted the Commonwealth to read into the record the entirety of Kimbrough's testimony from Hudson's and Hughes's first trial. Id.

- 4 -

Brown, during his testimony at the second trial, positively identified Hudson as one of Twitty's and Jones's shooters, although he had not done so during his testimony at the first trial. Id. at 1159. Hudson objected to Brown's first-time, in-court identification and moved for a mistrial, and the trial judge denied that motion. Hudson, 2000 WL 1477124, at *3.

Hudson was ultimately convicted in this second trial of second-degree murder, assault and battery with a dangerous weapon, armed assault with intent to murder, armed assault with intent to rob, and unlawful possession of a firearm. Hudson, 2015 WL 2037025, at *1. He received a sentence of life imprisonment for second-degree murder, a consecutive sentence of eight-to-ten years' imprisonment for assault and battery, and lesser concurrent sentences for the remaining offenses.

**B.**

Hudson appealed his convictions. On direct appeal to the MAC, he pointed to several alleged errors by the trial court, including its handling of the jury-selection process, its decision to allow Kimbrough to exercise his privilege against self-incrimination and then to permit Kimbrough's testimony from the first trial to be read into the record, and its refusal to declare a mistrial following Brown's surprise identification of Hudson. For reasons we will detail below, the MAC affirmed, see Hudson, 2000 WL 1477124. The Massachusetts Supreme Judicial Court ("SJC")

- 5 -

denied Hudson's application to obtain further appellate review ("ALOFAR"). See Commonwealth v. Hudson, 737 N.E.2d 467 (Mass. 2000) (unpublished table decision).

In 2001, Hudson filed a motion for a new trial pursuant to Massachusetts Rule of Criminal Procedure 30(b). In that motion, Hudson raised, among other claims, an ineffective assistance of counsel claim which precipitated five years of litigation, culminating in the SJC's denial of relief. See Hudson, 846 N.E.2d at 1152.

In 2006, following the unfavorable resolution of his first new trial motion, Hudson filed the petition for a writ of habeas corpus that is at issue in this appeal pursuant to 28 U.S.C. § 2254 in the United States District Court for the District of Massachusetts. Before the District Court had reached the merits of his habeas petition, Hudson sought and was granted a stay of those federal proceedings so that he could pursue a second new trial motion in state court. Hudson's second new trial motion was denied by the state trial court, and Hudson appealed.

While that appeal was pending, Hudson filed a third new trial motion in state court, which was also denied. Hudson appealed the denial of that motion as well, and the MAC consolidated its appellate review of both motions. In 2015, the MAC affirmed the denials of Hudson's second and third new trial motions in the last reasoned state court opinion authored in this

- 6 -

case to date. See Hudson, 2015 WL 2037025. Hudson then filed an ALOFAR, which the SJC denied. See Hudson, 35 N.E.3d 720.

Hudson subsequently returned to federal court and moved to reopen and amend his stayed petition for habeas corpus. The District Court granted Hudson's motions, after which Hudson filed his now-operative petition, which raised ten grounds for habeas relief, including, as relevant to this appeal, that the trial court violated Hudson's right to due process by (1) "permitting the prosecution to read the prior testimony of the key Commonwealth witness [Kimbrough] to the jury" after determining that he had asserted a valid Fifth Amendment right against self-incrimination and was thus unavailable to testify; (2) deciding "while empaneling the jury to change the number of jurors to be seated," thereby "unfairly prejudic[ing] [Hudson's] use of his peremptory challenges"; and (3) "refus[ing] to declare a mistrial after a surprise, first-time, in-court identification of [Hudson] by Larry Brown."

Hudson's petition for habeas corpus was referred to a United States Magistrate Judge for all pretrial proceedings. The Magistrate Judge then issued a Report and Recommendation suggesting that the District Court withhold judgment on the issue of Kimbrough's testimony pending further briefing by the parties but deny Hudson's petition on all other grounds. After receiving the parties' additional briefing on the issue of Kimbrough's

testimony, the Magistrate Judge issued a second Report and Recommendation suggesting that the District Court deny Hudson relief on that ground as well.

Hudson subsequently filed objections to both Reports and Recommendations, after which the District Court overruled Hudson's objections, accepted and adopted both Reports and Recommendations, and denied Hudson's petition in full. Hudson timely appealed.

## II.

In cases where, as here, "'the district court undertakes no independent factfinding [and] we are effectively in the same position as the district court vis-à-vis the state court record,' our review of a district court's denial of a habeas petition is de novo." Porter v. Coyne-Fague, 35 F.4th 68, 74 (1st Cir. 2022) (alteration in original) (quoting Pike v. Guarino, 492 F.3d 61, 68 (1st Cir. 2007)). "Our review of the state court decision is, in contrast, governed by [the Antiterrorism and Effective Death Penalty Act ("AEDPA")], which 'demands that a federal habeas court measure a state court's decision on the merits against a series of peculiarly deferential standards.'" Quintanilla v. Marchilli, 86 F.4th 1, 15 (1st Cir. 2023) (quoting Porter, 35 F.4th at 74 (internal quotation marks omitted)).

AEDPA's deferential standards are set forth in 28 U.S.C. § 2254(d), which provides that, "with respect to any claim that was adjudicated on the merits in State court proceedings," a

- 8 -

federal court may not grant a petitioner's application for habeas relief unless the petitioner can show that the state court's "adjudication of the claim -- (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Subsection 2254(d)(1) "splits into two distinct avenues for relief: the 'contrary to' clause and the 'unreasonable application' clause." Porter, 35 F.4th at 74. The "contrary to" clause is satisfied where the petitioner can show that "the state court arrive[d] at a conclusion opposite to that reached by [the Supreme] Court on a question of law or . . . decide[d] a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). The "unreasonable application" clause requires a showing that "the state court identifie[d] the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applie[d] that principle to the facts" of the petitioner's case. Id. at 413.

For purposes of this analysis, "clearly established Federal law, as determined by the Supreme Court of the United States" means "the holdings, as opposed to the dicta, of th[e]

- 9 -

Court's decisions as of the time of the relevant state-court decision." Id. at 412. "State courts must 'reasonably apply' existing Supreme Court precedent, but they need not 'extend that precedent.'" Porter, 35 F.4th at 74 (quoting White v. Woodall, 572 U.S. 415, 426-27 (2014)). "The upshot of the AEDPA habeas regime is that 'when the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion . . . a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable.'" Id. at 75 (quoting Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018)).

## III.

On appeal from the District Court's denial of his petition for habeas corpus, Hudson challenges the rejection of three of his asserted grounds for habeas relief. He contends that, with respect to each, the underlying state court ruling was either contrary to, or involved an unreasonable application of, Supreme Court precedent such that he is now entitled to relief pursuant to § 2254(d)(1). Hudson's first challenge pertains to his contention that his petition must be granted on the basis of his Confrontation Clause rights having been violated when the trial judge deemed Kimbrough unavailable to testify and subsequently permitted the prosecution to read into the record Kimbrough's testimony from Hudson's first trial. Hudson's second challenge pertains to his

contention that his petition must be granted because the trial judge's midstream decision during jury selection to reduce the total number of jurors to be empaneled unfairly prevented him from utilizing his statutorily allotted peremptory strikes, thereby denying him due process of law.  Hudson's third challenge concerns his assertion that he is entitled to habeas relief because the trial judge violated his due process rights in denying his motion for a mistrial after witness Larry Brown made a surprise in-court identification of him.

**A.**

We start with Hudson's challenge to the denial of his petition that concerns the Confrontation Clause -- which itself comes in two parts.  The first part pertains to the finding by the trial judge that Kimbrough was "unavailable" as a witness.  The second part pertains to Hudson's contention that, even if Kimbrough was unavailable, the testimony that Kimbrough gave at the first trial was not "reliable," thus making it improper for that testimony to have been read to the jury at the second trial.

**1.**

The District Court rejected the unavailability-based claim for habeas relief on the ground that Hudson procedurally defaulted it by failing to raise the claim on direct appeal in state court.  See 28 U.S.C. § 2254(b)(1); Josselyn v. Dennehy, 475 F.3d 1, 2-3 (1st Cir. 2007) (noting that § 2254(b)(1) requires a

state habeas petitioner to exhaust available remedies in state court); Evicci v. Comm'r of Corr., 226 F.3d 26, 27 (1st Cir. 2000) (per curiam) (same).

Hudson challenges the District Court's conclusion in part on the ground that he implicitly presented the claim to the state courts by citing to Ohio v. Roberts, 448 U.S. 56 (1980), abrogated by Crawford v. Washington, 541 U.S. 36, 68 (2004), in his brief to the MAC and in his ALOFAR to the SJC. But that citation itself fails to specify that the ground of challenge was to the finding of unavailability itself, as opposed to the "reliability" prong of Ohio v. Roberts, and nothing in the surrounding discussion in the brief in question suggests that the unavailability ground was being pressed by Hudson. Thus, we cannot see how we could conclude that the challenge to the trial judge's unavailability finding was "fairly presented" to the MAC, Baldwin v. Reese, 541 U.S. 27, 30 (2004), such that a reasonable jurist would have been alerted to the existence of the unavailability question, see Jaynes v. Mitchell, 824 F.3d 187, 192 (1st Cir. 2016); Sanchez v. Roden, 753 F.3d 279, 294 (1st Cir. 2014).

Hudson does also argue that, in any event, when the MAC affirmed his conviction on direct appeal, it addressed the claim (and, by extension, the SJC's summary denial of his ALOFAR addressed it, too). In support of that contention, Hudson directs our attention to this statement in the MAC's ruling as to his

- 12 -

Confrontation Clause claim: "Kimbrough had become unavailable to testify at the second trial by virtue of his exercise of his Fifth Amendment privilege against self-incrimination." Hudson, 2000 WL 1477124, at *3. In the preceding sentence, however, the MAC framed the claim of error to which it was turning its attention as relating to the question of reliability. And, in the rest of the paragraph, the MAC discussed exclusively the reliability prong of Ohio v. Roberts.

Thus, we do not read the statement by the MAC to which Hudson directs our attention to demonstrate that the MAC adjudicated his challenge to the unavailability finding. Indeed, when Hudson did ultimately present this claim in subsequent state-court collateral attacks, the state courts denied the claim on the basis of "an adequate and independent state procedural rule," Davila v. Davis, 582 U.S. 521, 527 (2017). When the MAC reviewed the consolidated appeals of Hudson's second and third motion for a new trial, it explained that it was reviewing "to determine only whether there has been error creating a substantial risk of miscarriage of justice," and in the course of that review, the MAC denied the claim, finding no error. 2015 WL 2037025, at *4. That feature of the ruling by the MAC is significant for present purposes because we have understood the last reasoned state court decision to have deemed a claim procedurally defaulted where the court applied the "miscarriage of justice standard." See Barbosa

- 13 -

v. Mitchell, 812 F.3d 62, 67 (1st Cir. 2016) (quoting Commonwealth v. Barbosa, 933 N.E.2d 93, 111 (Mass. 2010)).

Finally, Hudson argues that we must reach the merits of his unavailability claim because a "failure to consider" that claim "will result in a fundamental miscarriage of justice." Lee v. Corsini, 777 F.3d 46, 58 (1st Cir. 2015) (quoting Harris v. Reed, 489 U.S. 255, 262 (1989)). He contends that this "narrow exception," Burks v. Dubois, 55 F.3d 712, 717 (1st Cir. 1995), to the bar to our addressing a procedurally defaulted claim applies here, as he can make a "colorable showing of factual innocence," Watkins v. Ponte, 987 F.2d 27, 31 (1st Cir. 1993) (quoting McCleskey v. Zant, 499 U.S. 467, 495 (1991), superseded by statute on other grounds as recognized by Banister v. Davis, 140 S. Ct. 1698, 1707 (2020)). We disagree.

A showing of actual innocence must be supported by "new reliable evidence . . . that was not presented at trial," Lee, 777 F.3d at 62 (quoting Schlup v. Delo, 513 U.S. 298, 324 (1995)). Because Hudson's "argument on this point alludes to no new information suggesting innocence, but merely rehashes" evidence that was available at the time of his trial, it fails. Burks, 55 F.3d at 718.

**2.**

The District Court also rejected Hudson's reliability-based Confrontation Clause challenge concerning Kimbrough. The

District Court fully adopted the Magistrate Judge's Report and Recommendation as to this challenge, which recommended rejecting the challenge on the ground that the MAC's conclusion that Kimbrough's testimony fell within a firmly rooted exception to the hearsay rule, and thus had the required indicia of reliability under Ohio v. Roberts, was not unreasonable. Here, too, we agree.

In rejecting this Confrontation Clause-based claim on direct appeal, the MAC first noted that the issues in Hudson's first and second trials were "substantially the same" and that, at the first trial, "Kimbrough was cross-examined without undue restriction by competent defense counsel with similar motivation." Hudson, 2000 WL 1477124, at *3. The MAC then stated that Kimbrough's testimony from the first trial fell within a recognized exception to the hearsay rule, and thus was admissible, and, "[m]oreover," that "the evidence bore the required indicia of reliability to satisfy constitutional requirements." Id.

Neither party contests that -- in general -- prior recorded testimony is a firmly rooted hearsay exception that, under Ohio v. Roberts, could be admitted without a further showing of "adequate 'indicia of reliability,'" 448 U.S. at 66. Hudson contends, however, that the inquiry cannot end here in his case because the "central mission of the right to confrontation" was undermined at his trial. He contends this is so because the testimony read into evidence was testimony that Kimbrough had

- 15 -

asserted was false in an affidavit, and therefore, Hudson argues, the jury was denied a satisfactory basis from which to evaluate the prior testimony because there was no opportunity for cross-examination of Kimbrough at the second trial regarding his subsequent sworn recantation.

The MAC reasoned, however, that the recantation affidavit "did not affect the admissibility of the testimony, only its weight" and that, because Hudson was afforded the opportunity to impeach Kimbrough's prior recorded testimony with, among other things, the recantation affidavit, "the fact finder [was afforded] a 'satisfactory basis for evaluating the truth of the prior statement.'" Hudson, 2000 WL 1477124, at *3 (quoting Commonwealth v. Bohannan, 434 N.E.2d 163, 171 (Mass. 1982)). Where the MAC has explained its decision on the merits, we "simply review[] the specific reasons given by the state court and defer[]" if those reasons are reasonable. Porter, 35 F.4th at 75 (quoting Wilson, 138 S. Ct. at 1192). We cannot conclude that the MAC's reasons here were so unreasonable "that there could be no 'fairminded disagreement' on the question." Id. (quoting White, 572 U.S. at 427).

The reasons provided by the MAC in support of its conclusions were not unreasonable where then-governing Supreme Court precedent held that such testimony falling within a firmly rooted hearsay exception sufficed for purposes of the

- 16 -

Confrontation Clause "without more," Ohio v. Roberts, 448 U.S. at 66, and Hudson cites no authority for the proposition that a subsequent recantation so affected the reliability of the testimony that its admissibility under the Confrontation Clause is called into question, see Brown v. Ruane, 630 F.3d 62, 68 (1st Cir. 2011) ("[T]hat no holding of the Supreme Court required application to the factual context presented by the petitioner's claim is dispositive in the habeas analysis."). Thus, we see no basis for concluding that it was unreasonable for the MAC to treat the evidence admitted as reliable.

**B.**

We turn next to Hudson's challenge to the denial of his claim for habeas relief that concerns jury selection at his criminal trial. Here, Hudson contends that the constitutional violation was the state trial judge's late change in jury selection procedures, which he contends violated his right to due process and was a decision that was contrary to, or involved an unreasonable application of, federal law. We affirm the District Court's determination that Hudson has failed to make that showing.

**1.**

As described above, when jury empanelment for the second trial started, the trial judge informed Hudson that sixteen jurors would be seated and that, because Massachusetts law provided one peremptory challenge for each juror, Hudson would have sixteen

- 17 -

peremptory challenges.  See Hudson, 2000 WL 1477124, at *1.  Near the end of the third day of jury selection, and shortly after the selection of the fifteenth juror, the trial judge commented that the parties were "going to try [to seat] one more [juror], and after that I quit."  The next juror was then questioned, challenged by Hudson's co-defendant, and excused for cause.  The trial judge at that point declared, "That's it.  I'm going with fifteen."

At the point the trial judge stopped jury empanelment, Hudson had only exercised eleven of his sixteen peremptory challenges.  Hudson's counsel objected to the trial judge's decision to stop empanelment and stated that he had "saved a bunch of peremptories [sic] so [he] could have [his] perfect [sixteenth] juror" and that he had saved five challenges "waiting for that [sixteenth] juror who was going to be the person that [he] could best communicate with."  The trial judge noted the objection yet proceeded to trial with the fifteen jurors.

On direct appeal, Hudson argued that his right to due process, as articulated in Ross v. Oklahoma, 487 U.S. 81 (1988), was violated because he did not receive that which state law provided as to peremptory challenges.  Hudson contended that when the trial judge changed the number of jurors to be empaneled midstream, the trial judge rendered "worthless" five of the peremptory challenges with which Hudson had started the empanelment process.

In rejecting Hudson's challenge, the MAC first observed that under Massachusetts law, even with a timely objection, "no irregularity in the jury [empaneling] process" is sufficient to set aside a jury verdict absent "some proof of prejudice." Hudson, 2000 WL 1477124, at *1 (quoting Commonwealth v. Campbell, 474 N.E.2d 1062, 1067 (Mass. 1985) (citing M.G.L. c. 234, § 32)). The MAC proceeded to conclude that, because "there [was] no evidence that Hudson was precluded from exercising his peremptory challenges during the [e]mpanelment process or that he was forced to accept a juror who should have been excluded," there "was no error" in the trial judge proceeding as he did. Id. In coming to this conclusion, the MAC relied on the SJC's decision in Commonwealth v. Beldotti, 567 N.E.2d 1219 (Mass. 1991).

Hudson contends, to us, as he did to the District Court, that the MAC made and applied a statement of law contrary to Supreme Court precedent when it said that a showing of prejudice was required to set aside the verdict and, second, that the MAC unreasonably applied Ross in rejecting his due process claim and that, in that process, it misapplied state law. In this latter challenge, he argues that (1) the MAC erred in relying on Beldotti to conclude that there was no prejudice on the facts of Hudson's case because Beldotti was distinguishable to the point of irrelevance and (2) the MAC misapplied state law in concluding

- 19 -

that a showing of prejudice from a diminution of peremptory challenges was necessary to demonstrate a violation of state law.

**2.**

We start with Hudson's contention that the MAC, in applying the rule from Campbell requiring a showing of prejudice to set aside a verdict for any irregularities in the jury empaneling process, erred. In so contending, it is not entirely clear to us whether Hudson is arguing that the MAC's ruling was contrary to, or involved an unreasonable application of, Supreme Court precedent. But, either way, the argument is without merit.

Hudson premises the claim of error by the MAC on the fact that the Supreme Court has held that the denial or impairment of the right to a peremptory challenge is reversible error without a showing of prejudice. See Swain v. Alabama, 380 U.S. 202, 219 (1965), overruled on other grounds by Batson v. Kentucky, 476 U.S. 79 (1986) ("The denial or impairment of the right [to use peremptory challenges in jury selection] is reversible error without a showing of prejudice." (first citing Lewis v. United States, 146 U.S. 370 (1892) and then citing Harrison v. United States, 163 U.S. 140 (1896))). He thus contends that the MAC's adverse ruling on his Ross claim is fatally flawed because the MAC rejected the claim on the ground that Hudson had failed to show any prejudice from the denial of his peremptory challenges. We are not persuaded.

- 20 -

Hudson's challenge is based on the due process principles articulated by the Supreme Court in <u>Ross</u> v. <u>Oklahoma</u>. In <u>Ross</u>, the Court assumed without deciding that the Constitution applied the rule that denial of the right to a peremptory challenge is reversible error without a showing of prejudice to state criminal proceedings. <u>See</u> 487 U.S. at 89. The Court made clear, however, that the right is only "denied or impaired" if a defendant fails to receive "that which state law provides," as the Due Process Clause itself does not confer the right to a peremptory challenge. <u>Id.</u>

Thus, even if Hudson is correct that under <u>Swain</u> no showing of prejudice is necessary to establish reversible error under federal law once a denial or impairment of the right to a peremptory challenge that has been conferred by a State is established, it may nonetheless be true that, as a matter of state law, there is a prejudice requirement for purposes of showing that there was a denial or impairment of the underlying right.

Thus, if Massachusetts state law requires a showing of prejudice to establish a denial of a right to a peremptory challenge, then Hudson's challenge under <u>Ross</u> can succeed only if he can show that he was prejudiced by the asserted denial of peremptory challenges. So, to the extent the MAC is understood to be stating that such a showing of prejudice is necessary as a matter of state law to show the denial of the state law right to

- 21 -

peremptory challenge, then Hudson's contention fails because the MAC's application of Ross was not at odds in any respect with Supreme Court precedent.[2]

Hudson does argue that the MAC still unreasonably applied Supreme Court precedent in rejecting his Ross challenge because he was in fact denied that which state law provided to him with respect to the exercise of peremptory challenges and the MAC misapplied state law in concluding otherwise. But we conclude that Hudson has failed to make this showing.

**a.**

Hudson first contends that the MAC unreasonably applied state law by relying on the SJC's decision in Beldotti to conclude that, on the facts of his case, Hudson had failed to demonstrate prejudice flowing from the denial of the peremptory challenges to which he claimed he was entitled. Hudson argues that defense counsel in Beldotti did not object before the trial court and only raised the denial-of-a-peremptory-challenge issue on appeal; that, because of that forfeiture, the SJC was reviewing for a substantial risk of a miscarriage of justice; and that there was no evidence in the record suggesting that defense counsel would have exercised

---

[2] We note that Hudson is not bringing a separate due process claim that Massachusetts law violates his right to due process by requiring a showing of prejudice to prevail on a challenge to the denial of peremptory strikes as a matter of state law.

her or his peremptory challenges any differently had she or he known of the ultimate procedure on which the trial court would settle ahead of time. Thus, Hudson maintains, Beldotti has little relevance to his own case, in which defense counsel timely objected, stated on the record that he would have exercised his peremptory challenges differently had he known the trial judge would only seat fifteen jurors, and the MAC applied a less onerous standard of review.

But we do not understand the MAC to have concluded that there was no prejudice in Hudson's case because the facts were sufficiently similar to those in Beldotti that the SJC's no-prejudice conclusion in that case was controlling. Rather, we read the MAC merely to have relied on Beldotti for the simple proposition that, in the absence of a violation of state law or some other showing of unfairness, there is no federal due process problem. See Hudson, 2000 WL 1477124, at *1. Because Hudson makes no argument -- independent of the contention that Beldotti was distinguishable -- that the MAC's no-prejudice finding itself was unreasonable, any such argument is waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). We thus can discern no misapplication of state law by the MAC in this respect, let alone one that constitutes an unreasonable application of state law.

**b.**

Hudson next contends that the MAC misapplied state law in rejecting his Ross claim because Campbell's prejudice rule bears only on whether the state court will provide a remedy, in the form of setting aside a jury verdict, not on whether state law was violated because of a denial of a peremptory challenge. Thus, Hudson contends, the MAC misapplied state law in rejecting his Ross claim, because it failed to address whether he had been denied that to which he was entitled under state law and instead rejected the claim solely on the ground that he was not entitled to a remedy for having been denied that entitlement.

We again disagree. In fact, precisely because of the MAC's citations to Campbell and Beldotti, we do not see how else to read the MAC other than as addressing Hudson's contention pertaining to the diminution of his peremptory challenges and deciding that, as a matter of Massachusetts law, the entitlement to a certain number of peremptory challenges is a qualified one, that the state law entitlement is only denied when it may be shown that prejudice flows from the inability to exercise that many peremptory challenges.

This conclusion follows from how the MAC started by reciting the rule in Campbell that a showing of prejudice is necessary before substantively analyzing whether Hudson had shown prejudice. It was only after concluding that Hudson had not shown

prejudice that the MAC drew the ultimate conclusion that "[t]here was no error," with the citation to <u>Beldotti</u> explaining that in the absence of a state-law violation, or other showing of unfairness, no federal due process principle is violated. <u>See</u> <u>Hudson</u>, 2000 WL 1477124, at *1. Because of the MAC's explicit conclusion that there was "no error" and its invocation of <u>Beldotti</u> for a proposition of which a necessary premise is that there is no state-law violation, it is clear that the MAC was not deciding the remedial question of whether a state-law violation warranted setting aside the jury but rather was deciding that there was no violation of state law of which to complain.

To the extent Hudson contends that this conclusion itself was a misapplication of state law on the ground that there was no basis in state law for the MAC to have arrived at this conclusion because, first, the state rule of criminal procedure pertaining to defendants' entitlement to peremptory challenges says nothing about prejudice and, second, the only other Massachusetts case deciding a similar issue was <u>Beldotti</u>, which is distinguishable, we again conclude that Hudson's argument is without merit.

To prevail Hudson must show that the MAC's application of state law was unreasonable such that there could be no fair-minded disagreement among jurists as to the MAC's application of <u>Ross</u>. <u>See</u> <u>Porter</u>, 35 F.4th at 75. But where, as here, Hudson is

- 25 -

contending no more than that there was no Massachusetts precedent directly on point and the MAC was ostensibly deciding the issue in the first instance, that showing has not been made.[3]

## C.

We turn finally to Hudson's contention that he is entitled to a writ of habeas corpus based on the trial judge's failure to declare a mistrial after witness Larry Brown made a surprise, first-time, in-court identification of Hudson at trial. The District Court ruled otherwise on the ground that the MAC's rejection of this claimed due process violation was neither contrary to nor an unreasonable application of then-existing Supreme Court precedent, and we agree.

## 1.

As we noted above, Brown testified at Hudson's and Hughes's first and second trials as an eyewitness to the shooting of Twitty and Jones. At the first trial, Brown testified that he had been present at the shooting, and he positively identified Hughes as one of the assailants. However, he maintained that he

---

[3] As an aside, we note that assuming arguendo the MAC had misapplied state law in coming to its conclusion, and therefore Hudson was denied a peremptory challenge in violation of state law, the Supreme Court has explained that "errors of state law do not automatically become violations of due process" in the course of rejecting a due process challenge predicated on the seating of a juror over a defendant's peremptory challenge. Rivera v. Illinois, 556 U.S. 148, 160 (2009).

- 26 -

could not identify Hudson as having been one of the shooters. The Commonwealth thus did not ask Brown to identify Hudson during the first trial.

At Hudson's second trial, the Commonwealth once again called Brown to testify as an eyewitness. Before Brown was called to testify, the prosecutor expressed to Hudson's counsel that Brown would not be asked to identify Hudson. Then, during Brown's direct examination, the prosecutor prompted Brown "to tell us who you saw getting out of the car" that Brown had observed pull up to the scene immediately prior to the shooting. Brown replied, "The two gentlemen over there," indicating Hughes and Hudson, who were seated together at the defense table.

Hudson's counsel objected to the identification and requested a sidebar conference. At sidebar, the prosecutor explained, "I expected [Brown] to say that he saw [Hughes]. I didn't expect him to say he saw [Hudson] too. That's what he testified to before." The trial judge expressed that he "[did not] really think" that Brown's identification of Hudson had been the result of "chicanery or trickery on the part of [the prosecutor]," and he stated that there was therefore "no therapeutic remedy" available to cure the surprise identification. In response, Hudson's trial counsel moved for a mistrial, which motion the trial judge denied.

**2.**

Hudson contends that "it was constitutional error to deny the motion for mistrial" following Brown's surprise in-court identification of him.[4]   That is so, he argues, because "[t]he circumstances of Brown's identification [were] highly suggestive": Brown "had witnessed Hudson sitting at the defense table during several pretrial proceedings and at the first trial prior to identifying him at the second trial," and "Hudson was seated with his co-defendants who were known to Brown." Invoking then-existing Supreme Court precedent, which he asserts clearly establishes broadly that "reliability is the linchpin in determining the admissibility of identification testimony," Manson v. Brathwaite, 432 U.S. 98, 114 (1977), Hudson argues that because Brown's identification of Hudson was so unreliable, the MAC's determination that the trial judge did not err by denying Hudson's motion for a mistrial following the identification was contrary to or an unreasonable application of clearly established federal law

---

[4] In passing, Hudson also claims that Brown's identification of Hudson "should have been excluded" due to its unreliability, but he stops short of arguing that the trial judge's failure to exclude the identification was constitutional error.  Further, the record shows that Hudson's trial counsel did not move to exclude the identification but rather asked only that the trial judge declare a mistrial.  As such, to the extent that Hudson means to claim in the alternative that it was constitutional error for the trial judge not to have excluded the identification, that argument is waived.  See Zannino, 895 F.2d at 17.

- 28 -

such that he is entitled to habeas relief under 28 U.S.C. § 2254(d)(1). We disagree.

The MAC reasoned that the trial judge did not err by admitting Brown's identification of Hudson because "[u]nder the law in existence at the time of Hudson's trial, in-court identifications were inadmissible only where they were 'tainted by an out-of-court confrontation that was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" Hudson, 2015 WL 2037025 at *5 (quoting Commonwealth v. Crayton, 21 N.E.3d 157, 167 (Mass. 2014) (cleaned up)). "Because Hudson [did not] allege[] that . . . Brown's identification[ was] somehow tainted by improper or suggestive out-of-court identification procedures, and the record [did] not support such an inference," the MAC concluded, Hudson's claim failed. Id.

As the Report and Recommendation adopted by the District Court explained, the then-existing "clearly established law" concerning the reliability of witness identifications "ar[ose] in the context of unnecessarily suggestive pretrial identification followed by an in-court identification or the admission of the suggestive pretrial identification procedures." Indeed, in support of his contention that the circumstances of Brown's first-time, in-court identification were impermissibly suggestive, Hudson cites only to Supreme Court case law concerning the

- 29 -

suggestiveness of various pretrial, out-of-court identification procedures. See Brathwaite, 432 U.S. at 101-02 (witness identified the defendant pretrial after being shown a single photograph of the defendant at police headquarters); Moore v. Illinois, 434 U.S. 220, 229-30 (1977) (victim viewed the defendant and heard evidence implicating him at his arraignment before being asked to identify him as her assailant); Kirby v. Illinois, 406 U.S. 682, 691 (1972) (witness identified the defendants, before charges were filed and without defense counsel present, via a show-up where all present except the victim and defendants were police officers); Neil v. Biggers, 409 U.S. 188, 195 (1972) (victim identified the defendant pretrial via a single-suspect show-up).

Hudson does not argue that the record supports a finding that Brown was prompted at any point prior to his in-court identification to identify Hudson under any circumstances, suggestive or otherwise. He contends only that Brown's opportunities to observe Hudson at the defense table at the first trial and at multiple pretrial proceedings prior to the second trial combined to create impermissibly suggestive circumstances that tainted Brown's first-time, in-court identification of him. And, Hudson argues, because at the time of his second trial the Supreme Court had announced in Brathwaite that "reliability is the linchpin in determining the admissibility of identification testimony," 432 U.S. at 114, clearly established Supreme Court law

- 30 -

required the trial judge to declare a mistrial following Brown's unreliable identification.

But, as the Supreme Court has explained, while 28 U.S.C. § 2254(d)(1) "provides a remedy for instances in which a state court unreasonably applies [Supreme Court] precedent[,] it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error." White, 572 U.S. at 426. That means that, "'if a habeas court must extend a rationale before it can apply to the facts at hand,' then by definition the rationale was not 'clearly established at the time of the state-court decision.'" Id. (quoting Yarborough v. Alvarado, 541 U.S. 652, 666 (2004)).

We agree with the District Court that the facts of Hudson's case are distinct enough from those at issue in Brathwaite and the other precedent Hudson invokes that the MAC cannot be said to have misapplied clearly established federal law by denying Hudson relief on this claim. In Brathwaite, the Court considered the admissibility of an undercover officer's identification testimony where the officer had conducted a controlled buy of narcotics from the defendant, who was then unknown to him; given a detailed description of the defendant to another officer immediately following the controlled buy; and been presented two days later with a single photograph of the defendant, whom he confirmed was the man who had sold him the narcotics. See 432

- 31 -

U.S. at 100-02. To decide this question, the Brathwaite Court had to resolve a circuit split over whether to apply a per se exclusionary rule or a "totality of the circumstances" test focused on the reliability of the identification to determine the admissibility of "out-of-court identification evidence . . . obtained through unnecessarily suggest[ive] confrontation procedures." Id. at 110 (emphasis added).

Although Hudson is correct to point out that the Brathwaite Court ultimately held that "reliability is the linchpin in determining the admissibility of identification testimony," Brathwaite, 432 U.S. at 114, his argument abstracts this holding too far from its specific factual context concerning pretrial, out-of-court identifications. Hudson has not -- and cannot -- point to any then-existing Supreme Court case law that would have required the MAC to find constitutional error in his case without "extend[ing] the rationale" of the Brathwaite line of cases to the separate factual context of a surprise, first-time, in-court identification of a defendant by a testifying witness. As such, we conclude that Hudson is not entitled to habeas relief on this claim.[5]

_____

[5] Hudson points out that the "District Court agreed with [him] that the identification was unreliable and should not have been admitted." But the District Court, reviewing Hudson's claim de novo and "assuming the Supreme Court law cited by [Hudson] applies to a first-time in[-]court identification," nonetheless "[found]

- 32 -

**IV.**

For the foregoing reasons, the judgment of the District Court is **affirmed**.

---

no violation of [Hudson's] due process rights" given the totality of the circumstances. <u>Hudson</u> v. <u>Kelly</u>, No. 06-cv-11755-IT, 2021 WL 4472858, at *11 (D. Mass. Sept. 30, 2021) (considering that defense counsel "did not ask to strike the testimony," that Brown's "identification was not offered to the jury as a pre-trial identification entitled to some weight because of its proximity to the time of the events in question" but rather "occurred in real time before the jury (which could take note itself of the suggestive circumstances of the identification)," and that "Brown was then subject to cross-examination that allowed the jury to determine this lack of reliability."). And, reviewing de novo ourselves, <u>see</u> <u>Porter</u>, 35 F.4th at 74, we agree that any error was harmless in view of the same facts.